UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCOIS P. GIVENS,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, *et al.*,<br><br>    Defendants.<br>_____/ | No. C-06-2505 EMC (pr)<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT**<br><br>**(Docket No. 67)** |

## I.  INTRODUCTION

In this *pro se* prisoner's civil rights action, Francois Givens sued two officers in the San Francisco Police Department for acts and omissions that occurred on the day Mr. Givens was arrested for stabbing his ex-girlfriend. Claims against other Defendants have been dismissed. The two remaining Defendants now move for summary judgment and Plaintiff opposes the motion. For the reasons discussed below, the Court will grant the motion and enter judgment in favor of Defendants.

## II.  BACKGROUND

A.  The Facts

The complaint in this action was filed on April 11, 2006. Mr. Givens had given the complaint to prison officials to mail to the Court on April 6, 2006, according to a certificate of service attached to the complaint. *See* Docket # 1, last page. Mr. Givens filed a first amended complaint on May 12, 2010, after his release from custody. The Court determined that, liberally construed, the first amended complaint stated cognizable § 1983 claims against Defendants Merino

and Gratz for violations of Mr. Givens' Fourth Amendment rights based on (1) their alleged use of excessive force in handcuffing Mr. Givens too tightly, and (2) their alleged failure to get proper medical treatment for Mr. Givens. *See* Order of Service, p. 4.

The following facts are undisputed unless otherwise noted:

The events and omissions that give rise to the complaint occurred on October 5, 2001 while Mr. Givens was an arrestee in the custody of the San Francisco police. Defendants Gratz and Merino were police officers in the San Francisco Police Department that day.

On October 5, 2001, Mr. Givens was arrested near the location where he stabbed his former girlfriend. At the time, he weighed "over 300 pounds." Docket # 70, Ex. A (Givens Depo.), RT 103. He was handcuffed at the scene by San Francisco police officer Ng. *Id.* Mr. Givens was transported to the San Francisco Police Department's Central Station by officer Gratz and another officer. RT 108. At the Central Station, he was taken by officer Gratz and another officer to a room in which there was a bench. RT 111. The handcuffs that had been on Mr. Givens were removed, and then he was handcuffed to the bench. RT 114-115. Mr. Givens "didn't see how they attached [him]," but thought that the officers either removed and re-attached the handcuffs, or put a second pair of handcuffs on him to secure him to the bench. RT 115. The handcuffs were "much tighter" when he was sitting on the bench. RT 116. Mr. Givens does not know who handcuffed him to the bench, but believes officer Gratz was at least present because he saw Gratz and another person – possibly officer Merino – walk away after the handcuffing. RT 116. Mr. Givens remained handcuffed to the bench for 45-60 minutes, RT 117. During that time, he "was screaming at the top of [his] lungs for these handcuffs to be loosened up." RT 117. He also told someone that he was a diabetic, the cuffs were too tight and his blood circulation was getting cut off. RT 120. There is no evidence that Mr. Givens was violent or combative at the station, but it also is undisputed that he was just ending a drug and alcohol binge that had lasted for days and had just stabbed someone.

Mr. Givens later was taken to the county jail, where he encountered a jail health nurse during the intake procedure. RT 130. The nurse asked Mr. Givens why he was sweating so much, and Mr. Givens told her that he "was diabetic, and had hypertension, and had been drinking and using drugs for an extended period of time." RT 130. In response to questions, Mr. Givens told the nurse that

2

1  he had been taking several medications – *i.e.*, "glyburide, metformin" and maybe blood pressure
2  medication – but that he had not been taking the medications for some time.  RT 131-32.  The nurse
3  took his vital signs, and may have drawn blood.  RT 132.  The nurse then said, "'You can't be
4  admitted to the jail because you're in danger of having a stroke,'" RT 132, and/or told officer Gratz,
5  "'We can't admit him here, he's in danger of having a stroke.'"  RT 133.  Officer Gratz responded to
6  the nurse: "'Can't you call somebody?'"  RT 133.  Officer Gratz asked the nurse to call an on-call
7  doctor.  RT 137.  The nurse called a doctor, and Mr. Givens was not sent to the hospital.  RT 134;
8  Docket # 1, Ex. B, p. 1.  Officer Gratz remained until Mr. Givens was admitted to the jail.  RT 137.
9  Mr. Givens was given medications for his diabetes before he was actually moved into the jail
10 population.  In his original complaint, Mr. Givens also alleged that he had been given "diabetes
11 medication and a sack lunch around 4:00 p.m., after which he slept on a cell floor because of
12 overcrowding at the jail, while in a comatose-like state.  Around 7:00 p.m., the Plaintiff was
13 awakened to give a statement to SFPD Inspector Quesada, after which, glucose readings revealed
14 that the Plaintiff's glucose count had fallen to 78 from 405."  Docket # 1, pp. 3-4.  The jail nurse's
15 notes from 8:00 p.m. on October 5, 2001 stated that the inmate had been given his diabetes
16 medications, that his blood sugar had dropped from 405 at 3:15 to 78 at 7:45, and that the
17 "asymptomatic" inmate was given food and hot chocolate, as well as extra sugar to hold.  Docket #
18 1, Ex. B, p. 3.  His blood pressure was listed as 116/62, his pulse was 88, and he had no reported
19 history of hypertension.  *Id.*

20       Mr. Givens did not complain to the intake nurse that his wrists were sore from the handcuffs.
21 RT 134.  After the removal of the handcuffs, Mr. Givens had marks on his left wrist from an allergic
22 reaction to his watch and his right wrist "was very red," although he does not recall having any
23 bruising.  RT 135-36.  The first time he told anyone about his wrist pain was several days later when
24 he was "coming out of [his] haze;" he attempted to get up from the floor and felt a sharp pain in his
25 hand.  RT 139.  At that time he told another inmate.  Mr. Givens eventually sought medical
26 treatment and was seen by the jail medical staff for pain in his hand on November 29, 2001 and
27 December 5, 2001.  Docket # 70-3, pp. 1-3.  His wrist was x-rayed on December 6, 2001; the x-ray
28 report listed the impression as "degenerative changes of the lunotriquetral joint" and noted a

1  "subcondral cyst within the lunate." *Id.* at 4, 6. In another medical record for an exam on April 1,
2  2002 when Mr. Givens complained of elbow pain, the nurse practitioner wrote that Mr. Givens had
3  stated he was "doing push ups and leg raises, chrunches (sic) to get enough exercise." *Id.* at 9.
4      On May 25, 2011 – ten years after the handcuffing incident and two years after he was
5  released from custody – Mr. Givens went to a hand surgery specialist for an evaluation of his right
6  wrist. According to the hand surgeon, Mr. Givens "state[d] it all started after he was placed in
7  restraints in 2001 in San Francisco." Docket # 88-3, p. 4. The hand surgeon's report included this
8  information:

> DIAGNOSTIC IMAGING: Review of the radiographs from UMC was negative for any fractures or bony abnormalities, except for a healed distal phalanx fracture.
>
> IMPRESSION: The patient's symptoms of pain in the wrist seem to be centered around the carpal bossing.
>
> DECISION MAKING/PLAN: He states the pain is only occasional and he has otherwise fairly well adapted to it. We discussed treatment options including surgical excision of the carpal boss. However, at this time, the patient has elected to leave the hand alone. He is to contact me should he have any questions or concerns in the future.

16 Docket # 88-3, pp. 4-5. After receiving the report, Mr. Givens sent the hand surgeon a letter asking
17 that the first sentence of the "Decision Making/Plan" section be amended to include a proposed
18 description that had a more dramatic and serious description of the pain and limitations on his hand.
19 *See id.* at 3.

20 B.   Mr. Givens' Criminal Case

21      The arrest that occurred on October 5, 2001 led to a criminal conviction in 2002. As the
22 California Court of Appeal described it, Mr. Givens had "stabbed his estranged girlfriend in the
23 course of a heated discussion, and as a result was convicted of attempted voluntary manslaughter,
24 infliction of corporal injury on a former cohabitant resulting in a traumatic condition, and assault
25 with a deadly weapon." *People v. Givens*, 2006 WL 187713, *1. The California Court of Appeal
26 reversed the conviction for attempted voluntary manslaughter for instructional error and otherwise
27 affirmed the judgment of conviction. *Id.* Mr. Givens' petition for review was denied. He was
28 released from custody in or about August 2008, after serving his prison sentence.

1    One of the arguments Mr. Givens has made throughout the years is that he stabbed the victim in self-defense, after she attacked him with a box cutter. He apparently believes the police, prosecutor and his several defense attorneys did an inadequate job investigating the crime and the box cutter evidence. His habeas petition challenging his conviction is pending in this Court in *Givens v. State of California*, No. C 07-1448 EMC.

C.    Mr. Givens' Earlier Federal Civil Rights Actions[1]

1.    The 2002 Action

In 2002, Mr. Givens filed a civil rights complaint in this Court, *Givens v. City and County of San Francisco*, No. C 02-4764 MJJ (the "2002 action"). In that complaint, Mr. Givens alleged two sets of claims. The first set of claims were against police officers, prosecutors, and defense attorneys for their conduct related to the criminal case for which he was incarcerated. The second set of claims were against jail officials regarding the conditions at the jail where he was then in custody. The claims against jail officials were described in a 13-page statement appended to the 2002 complaint that discussed, among other things, the jail officials' failure to adequately address his diabetes and hypertension on and after October 5, 2001,[2] as well as numerous other problems he had encountered at the jail after that date concerning medical care, mail, housing decisions, foot care, lunch delivery, court transportation issues, and holding cell cleanliness. Complaint in 2002 action, "Statement of Claim # 2." Neither set of claims mentioned the tight handcuffing that is the subject of the complaint in the present action (i.e., Case No. C 06-2505 EMC). Judge Jenkins dismissed the complaint in the 2002 action without prejudice, giving separate reasons for the two

---

[1] The two earlier civil rights complaints are relevant to the analysis here, yet are difficult to view because they were not electronically filed and the case files must be retrieved from the Federal Records Center. For the convenience of anyone reviewing this matter, the Clerk will e-file as exhibits in the Court file for this action (*i.e.*, Case No. C 06-2505 EMC) the following documents: the complaint and order of dismissal from Case No. C 02-4764 MJJ, and the complaint and order of dismissal from Case No. C 03-1275 MJJ.

[2] Mr. Givens alleged in the 2002 action that "S.F.P.D. Arresting Officer # 2 refused to take me to the hospital, and asked Intake Nurse # 1 to call a doctor instead. If Arresting Officer # 2 would have taken me to S.F. General, the wounds that were incurred during the altercation would have been documented." Complaint in 2002 Action, Statement of Claim # 2, p. 2.

sets of claims. The first set of claims were dismissed as barred by the rule in *Heck v. Humphrey*, 512 U.S. 477 (1994).

> Plaintiff claims that the police officers and prosecutors committed misconduct that led to his prosecution for murder. He also claims that his defense attorneys have provided him with [ineffective] assistance of counsel. If these claims are true, they would call into question the validity of his criminal charges. Consequently, these claims are barred by *Heck*, and are DISMISSED without prejudice to refiling in a § 1983 complaint once the charges have been dismissed, reversed, expunged, set aside or called into question.

Order of Dismissal And Denying Leave To Proceed In Forma Pauperis in 2002 action, p. 2. The second set of claims, concerning jail conditions, were dismissed as unexhausted. "With respect to plaintiff's claims regarding jail conditions, the dismissal is without prejudice to refiling after all available administrative remedies have been exhausted." *Id.* at 4.

2. The 2003 Action

In 2003, Mr. Givens filed another civil rights complaint in this Court, *Givens v. San Francisco Police Department*, No. C 03-1275 MJJ (the "2003 action"). In that complaint, Mr. Givens alleged that San Francisco Police Department officers "failed to perform an adequate investigation in this case," with respect to a box cutter that his ex-girlfriend allegedly possessed when he stabbed her. Complaint in 2003 action, p. 3. Mr. Givens alleged that the police chief's failure to conduct a requested investigation into "many discrepancies" in his case "led to [Givens'] conviction." Judge Jenkins dismissed the action because the claims concerning the criminal proceedings were duplicative of the claims raised in the 2002 action that were barred under the rule in *Heck*. "[P]laintiff clearly indicates in the instant complaint that he is still incarcerated and that he still has the conviction. In this action, plaintiff has for a second time brought the same claims of police misconduct that would call into question an existing conviction and his current incarceration. As a result, the court finds this action to be duplicative." Order Of Dismissal in 2003 action, p. 2.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court will grant summary judgment "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")  The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted.)  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

On issues as to which the moving party bears the burden of proof at trial – such as the qualified immunity defense in this case – he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. *Id.* at 1537.  Once the moving party has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not

based purely on his belief but on his personal knowledge).  Plaintiff's amended complaint does not count as evidence because, although he stated that it was "sworn true," the statement was not made under oath or under penalty of perjury.

## IV.   DISCUSSION

### A.   The Action Is Time-Barred

In an action brought under 42 U.S.C. § 1983, the court applies the limitations period of the forum state's statute of limitations for personal injury torts. *See Wilson v. Garcia*, 471 U.S. 261, 276 (1985); *Elliott v. City of Union City*, 25 F.3d 800, 802 (9th Cir. 1994).  The statute of limitations in California for personal injury torts, and hence for § 1983 claims, was one year until the legislature changed it to two years effective January 1, 2003. *See Maldonado v. Harris*, 370 F.3d 945, 954 (9th Cir. 2004); former Cal. Civ. Proc. Code § 340(3) (one-year general residual statute of limitations for personal injury actions); Cal. Civ. Proc. Code § 335.1 (current codification of residual limitations period); *see Elliott*, 25 F.3d at 802.  Mr. Givens' case is subject to the two-year limitations period because, due to tolling for imprisonment discussed below, his limitations period had not expired before the law changed. *See generally Maldonado*, 370 F.3d at 954.

Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers v. Lewis*, 174 F.3d 987, 991-92 (9th Cir. 1999); *Elliott*, 25 F.3d at 802.  Here, the claims accrued on October 5, 2001, the day Mr. Givens was arrested and allegedly subjected to tight handcuffs and a medical delay. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 381 (9th Cir. 1998) (plaintiff's excessive force claim accrued on day of his arrest).  The complaint was filed on April 6, 2006, about 4-1/2 years later.  Although the complaint was not stamped "filed" until April 11, 2006, Mr. Givens receives the benefit of the prisoner mailbox rule and his complaint is deemed to have been filed on April 6, 2006, the date on which, according to the proof of service, Mr. Givens gave it to correctional officers to mail to the Court. *See Stillman v. LaMarque*, 319 F.3d 1199, 1201 (9th Cir. 2003) (to benefit from the mailbox rule, a prisoner must meet two requirements: (1) he must be proceeding without assistance of counsel, and (2) he must deliver his filing to prison authorities for forwarding to the court).  The

complaint was filed too late (more than two years after the claims occurred), unless the limitations period was tolled for some reason.

A federal court must give effect to a state's tolling provisions. *See Hardin v. Straub*, 490 U.S. 536, 543-44 (1989). Mr. Givens argues that he is entitled to both statutory and equitable tolling.

1.  Statutory Tolling

Mr. Givens is entitled to two years of tolling for the disability of imprisonment. California recognizes imprisonment as a disability that tolls the statute of limitations when a person is "imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term less than for life." Cal. Civ. Proc. Code § 352.1(a). The tolling is not indefinite, however; the disability of imprisonment delays the accrual of the cause of action for a maximum of two years. *Id*. Defendants do not dispute that Mr. Givens was in custody for at least two years after his cause of action accrued on October 5, 2001. Thus, the limitations period was tolled for two years under § 352.1, and the two-year limitations period began on October 5, 2003.

Mr. Givens urges that he also is entitled to tolling under California Government Code § 945.3[3] because charges were pending against him until his sentencing on December 20, 2002. Mr. Givens argues that § 945.3 prevented him from filing this action. That precise argument based on the prohibition contained in the first paragraph of § 945.3 fails because the first paragraph does not bar a suit under § 1983. *See Harding v. Galceran*, 889 F.2d 906, 908 (9th Cir. 1989).

---

[3] Section 945.3 of the California Government Code provides:

> No person charged by indictment, information, complaint, or other accusatory pleading charging a criminal offense may bring a civil action for money or damages against a peace officer or the public entity employing a peace officer based upon conduct of the peace officer relating to the offense for which the accused is charged, including an act or omission in investigating or reporting the offense or arresting or detaining the accused, while the charges against the accused are pending before a justice, municipal or superior court.
>
> Any applicable statute of limitations for filing and prosecuting these actions shall be tolled during the period that the charges are pending before a municipal or superior court.

Nonetheless, the tolling provision in the second paragraph of § 945.3 does apply to § 1983 claims. *See id.* However, it does not help Mr. Givens under the circumstances of his case. Mr. Givens argues that he should receive tolling under § 945.3 until December 20, 2002, and then the 2-year tolling provision under § 352.1 for the disability of imprisonment should start. Even assuming the challenged conduct occurring *after* Mr. Givens' arrest is sufficiently related to the offenses charged so as to trigger tolling under § 945.3, he cannot extend or tack one tolling period after another. "[I]t is a settled rule of construction that the exemption period cannot be extended by the connection of one disability with another; in other words, a succession of disabilities cannot be tacked upon the first disability so as to prevent the operation of the statute." *Rose v. Petaluma & Santa Rosa Ry. Co.*, 64 Cal. App. 213, 217 (Cal. Ct. App. 1923), *disapproved on other grounds in Harris v. Industrial Accident Comm'n of California*, 204 Cal. 432, 438 (Cal. 1928). The California Supreme Court explained long ago that "one disability cannot be tacked onto another" to toll the statute of limitations." *California Sav. & Loan Soc'y v. Culver*, 127 Cal. 107, 111 (Cal. 1899). A number of courts have followed *Rose* and declined to tack disabilities. *See Smith v. Kouri*, 2011 WL 2790191, *2 (C.D. Cal. 2011) (refusing to allow tolling for both minority and later incarceration for a plaintiff who was attacked while a minor, and whose imprisonment started a few months later while he was still a minor); *Gutierrez v. Butler*, 2008 WL 436948, *3 (E.D. Cal. 2008) (refusing to extend the limitations period for the four months during which the incarcerated prisoner was exhausting administrative remedies because that period "was subsumed by the longer, two-year statutorily-created disability for his imprisonment."); *Gamba v. Woodford*, 2007 WL 2481746, *2-*3 (E.D. Cal. 2007) (plaintiff cannot tack together his intermittent periods of insanity and instead must show he was continuously insane); *Funtanilla v. Rubles*, 2003 WL 21309491, *6 (N.D. Cal. 2003) (plaintiff cannot tack together his intermittent periods of insanity). *But cf. Burns v. DeCarr*, 2010 WL 744395, * 2 (S. D. Cal. 2010) (allowing the time for an *equitable* tolling event that took place while the limitations period was otherwise being statutorily tolled for the disability of imprisonment to be tacked on to the end of the limitations period).

Furthermore, once tolling starts under one provision, it cannot be interrupted by another tolling provision. *California Savings & Loan Soc'y*, 127 Cal. at 111 ("after a statute is under way,

1  no subsequent accruing disability can in any way affect it"). *See* Cal. Code Civ. Proc. § 357;
2  *Larsson v. Cedars of Lebanon Hosp.*, 97 Cal. App. 2d 704, 707 (Cal. Ct. App. 1950); *Rose*, 64 Cal.
3  App. at 217.  Here, the limitations period was already being tolled under § 352.1 starting on October
4  5, 2001.  The tolling allowed by § 945.3 would have started five days later on October 10, 2001, the
5  date the criminal complaint was filed against Mr. Givens, *see* Resp. Ex. 1 (Clerk's Transcript, p. 4)
6  in *Givens v. Martel*, C 07-1448 EMC.  *See Torres v. City of Santa Ana*, 108 F.3d 224, 227 (9th Cir.
7  1997).  Under the law discussed above, the tolling could not occur for five days under § 352.1, then
8  be interrupted by § 945.3 tolling until December 2002, and then resume again under § 352.1.

9        Two cases have applied both § 352.1 and § 945.3 tolling, but both are distinguishable from
10 Mr. Givens' case.  In *Renteria v. City of Maywood*, 2009 WL 3297152 (C. D. Cal. 2009), in
11 evaluating the timeliness of an excessive force during arrest claim, the court allowed § 352.1 tolling
12 for the four days the plaintiff was in custody before plaintiff was released on his own recognizance
13 and charges were filed, and then allowed § 945.3 tolling until nine months later when the charges
14 were dismissed.  In *Renteria*, the court had no occasion to consider whether § 352.1 tolling could be
15 re-started thereafter.  In *Jackson v. McMillin*, 2006 WL 279335 (N. D. Cal. 2006), the court assumed
16 for purposes of argument that the plaintiff was charged on the day of his arrest and therefore applied
17 § 945.3 from the day of the arrest through the date of conviction and then allowed the § 352.1 tolling
18 to start.  Again the court in *Jackson* had no occasion to determine whether § 352.1 tolling could
19 start, pause, and later restart.  To hold that tolling, once starting, can be interrupted by another
20 tolling provision, only to have the remainder of the first tolling "banked" for the period subsequent
21 to the second tolling period would violate the rule that "when the statute has begun to run no
22 subsequent accruing disabilities can interrupt [as opposed to replace] it." *California Savings &*
23 *Loan Soc'y.*, 127 Cal. at 111.

24       Mr. Givens also argues that the limitations period should be tolled for the disability of
25 insanity from April 23, 2002, though August 2, 2002, because he "was being evaluated for
26 placement in a state hospital," and the criminal court had ordered a mental competency evaluation.
27 Docket # 88, p. 17.  California Code of Civil Procedure § 352(a) provides for tolling if the person is
28 insane at the time the cause of action accrued.  For purposes of the tolling provision, "the term

11

'insane' has been defined as a condition of mental derangement which renders the sufferer incapable of caring for his property or transacting business, or understanding the nature or effects of his acts." *Hsu v. Mt. Zion Hospital*, 259 Cal. App. 2d 562, 571 (Cal. Ct. App. 1968); *cf. Feeley v. Southern Pac. Trans. Co.*, 234 Cal. App. 3d 949, 952 (Cal. Ct. App. 1991) (tolling proper for time during which plaintiff was in a coma immediately after the injury that gave rise to his cause of action); *Snyder v. Boy Scouts of America*, 205 Cal. App. 3d 1318, 1324 (Cal. Ct. App. 1988) (post-traumatic stress disorder does not count as "insanity" that tolls the limitations period). Mr. Givens is not entitled to tolling for the disability of insanity because the disability of insanity must exist at the time the cause of action accrues. Cal. Code Civ. Proc. § 357. Mr. Givens receives no tolling for the disability of insanity for the additional reason that, on the evidence in the record, no reasonable jury could find that he was insane. Mr. Givens appears to deny that he was incompetent, and the trial court found him competent to stand trial. *See People v. Givens*, 2006 WL 187713, *3. Even if Mr. Givens' scant evidence could raise a triable issue of fact that he was insane, it wouldn't help him because the limitations period already was being tolled under § 352.1 for the disability of imprisonment at the time of the time of the alleged insanity.

Mr. Givens also contends that he should receive some sort of tolling for "nearly 4 months without access to a law library" when he was in the San Quentin Reception Center during April - May 2003, and at "Kern County State Prison reception center" in June-July 2003. Docket # 88, pp. 18-19. The Court disagrees. The tolling allowed for the disability of imprisonment is allowed in part because prisoners have limited access to legal resources, so that same limited access to legal resources does not provide a separate basis for tolling the limitations period. *See generally McDonald v. Antelope Valley Community College Dist.,* 45 Cal. 4th 88, 105 (Cal. 2008). Even if tolling was allowed for limited law library access, the time during which Mr. Givens contends he had limited law library access is time during which the limitations period already was being tolled under § 352.1 for the disability of imprisonment.

    2.    <u>Equitable Tolling</u>

Under California law, equitable tolling is appropriate in a later suit when an earlier suit was filed and the record shows: "'(1) timely notice to the defendant in filing the first claim; (2) lack of

1  prejudice to defendant in gathering evidence to defend against the second claim; and, (3) good faith
2  and reasonable conduct by the plaintiff in filing the second claim.'" *See Daviton v. Columbia/HCA*
3  *Healthcare Corp*, 241 F.3d 1131, 1137-38 (9th Cir. 2001) (en banc) (citation omitted). California
4  has long refused to apply the equitable tolling doctrine to toll the limitations period on a claim for a
5  distinct wrong that was *not* the basis of the earlier proceeding. *Id.* At 1141.

6       Mr. Givens does not satisfy the three-pronged test for equitable tolling. Although he filed
7  actions in 2002 and 2003, those cases were dismissed at the initial review stage; Defendants were
8  never served with those complaints and there is no evidence they otherwise received copies.
9  Additionally, neither the 2002 action nor the 2003 action would have put Defendants on notice of
10 the excessive force and medical delay claims asserted in the present action. The earlier federal
11 actions would not have alerted officers Merino and Gratz of the need to begin investigating the
12 handcuffing and the request to the nurse to call someone instead of sending Mr. Givens to the
13 hospital.

14      In the 2002 action, Mr. Givens did not mention the tight handcuffs at all and mentioned the
15 hospital avoidance issue in a different context. In the 2003 action, Mr. Givens did mention tight
16 handcuffs, but did so in an attachment to the complaint rather than in the body of the complaint, did
17 not mention either Defendant as being involved with the handcuffing, and gave no indication he was
18 attempting to assert a claim based on the tight handcuffs. The handcuffing was mentioned in the
19 midst of a lengthy description of the allegedly botched investigation into the crime for which Mr.
20 Givens was convicted. The thrust of the 2003 action was unmistakably one for a wrongful
21 conviction and constitutional violations in the course of the investigation of that action. Mr. Givens
22 also mentioned that officer Gratz's question to the intake nurse that resulted in Mr. Givens being
23 admitted to the jail rather than being taken to a hospital, but this event was described as it related to
24 him being deprived of an evidence-gathering opportunity rather than being deprived of medical care.
25 *See Givens v. San Francisco Police Department*, No. C 03-1275 MJJ, Complaint at Ex. J, p. 3 ("Had
26 Officer Gratz taken me to San Francisco General Hospital, the injuries incurred by the box cutter

13

1 would have been documented.") Even with liberal construction, one cannot reasonably view the
2 complaint in the 2003 action to have included either of the claims asserted in the present action.[4]

3        Mr. Givens' letter-writing campaign and complaining to various officials[5] would not have
4 given Defendants Gratz and Merino notice of the claims and did not amount to reasonable and good
5 faith efforts to pursue his claims in an alternative forum.

6        Mr. Givens also has not shown that Defendants would not be prejudiced by his delay in
7 pursuing this action. Witnesses disappear or have faded memories, and documents disappear.
8 *See Pagtalunan v. Galaza*, 291 F.3d 639, 643 (9th Cir. 2002) ("unnecessary delay inherently
9 increases the risk that witnesses' memories will fade and evidence will become stale"). Defendants
10 point out that at least part of the computer aided dispatch report that would provide information
11 about who was at the scene and transported Mr. Givens – matters that Mr. Givens doesn't recall with
12 any clarity – may be missing. Mr. Givens provided only a single page of the dispatch transcript and
13 didn't dispute that there were more pages to the transcript. This information is particularly relevant
14 as to officer Merino, because Mr. Givens is not certain as to whether Merino was at the station when
15 Mr. Givens was handcuffed. Mr. Givens, who was at the end of a drug and alcohol binge on the day
16 in question, was unable to state whether he recalled Merino at the station.

17        Mr. Givens also has not shown that he acted reasonably or in good faith. As Defendants
18 point out, any argument by Mr. Givens that he relied on the dismissal of the earlier cases under *Heck*
19 to think that he was unable to bring the present claims is not persuasive. The dismissal orders cited
20 to *Heck*, which Mr. Givens could have read and learned that they only barred claims that called into
21 question the validity of one's conviction or confinement and therefore would not have posed a bar to

---

[4] If Mr. Givens somehow thought he had pled those claims, he would have learned otherwise when he received the April 10, 2003 order of dismissal in the 2003 action because that order did not mention these claims and instead described the complaint as being claims of police misconduct that would call into question an existing conviction and incarceration.

[5] Mr. Givens sent a letter dated August 9, 2002 to "60 Minutes" in New York, with copies to several government officials, the ACLU, and the NAACP; sent a letter dated November 24, 2003 to the First Appellate District Court in San Francisco; sent a letter dated November 24, 2003 to the California Attorney General; and sent a March 24, 2003 memorandum to the Office of Citizen's Complaints in San Francisco. *See* Docket # 88-7 and # 88-8. Defendants are not listed as addressees or as recipients of copies of any of these documents.

the present claims. This was apparent from the orders of dismissal in the 2002 and 2003 actions. Indeed, the order of dismissal in the 2002 action specifically made the distinction between those claims that would call into question the validity of his conviction and those claims that were about the conditions of confinement, with only the former being subjected to the *Heck* bar. This case concerns conditions of post-arrest confinement and is not barred.

Moreover, if *Heck* applied to the present claims, they still would be barred. Mr. Givens contends that he thought the reversal of the attempted manslaughter conviction by the state appellate court removed the *Heck* bar, but offers no explanation why reversal on only one of the three charges (all of which were for the same attack on the same victim) would have removed any *Heck* bar.

With the two-year limitations period plus the two-year tolling for his imprisonment, Mr. Givens had four years to file his complaint. He did not file his complaint until four years and six months after the claim accrued. Mr. Givens' complaint was filed six months too late and therefore is time-barred. Defendants are entitled to judgment on the merits as to Mr. Givens' claims against them because his claims are time-barred. In the next section, the Court will discuss a separate and additional reason why Defendants are entitled to judgment in their favor on Mr. Givens' claim that they were deliberately indifferent to his medical needs when officer Gratz asked the jail intake nurse to call someone before sending Mr. Givens to the hospital.

B.  <u>Defendants Are Entitled To Judgment On The Medical Care Claim On The Merits</u>

In light of the fact that Mr. Givens "had not been convicted of a crime, but had only been arrested, his rights derive from the due process clause rather than the Eighth Amendment's protection against cruel and unusual punishment." *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002). As a person in custody, he had a right "'to not have officials remain deliberately indifferent to [his] serious medical needs.'" *Id.* (citation omitted). To prove that the response of the jailers or other custodial officers to an arrestee's medical needs was constitutionally deficient, the arrestee must establish (1) a serious medical need and (2) deliberate indifference to that need by jail or custodial officials. *See id.; McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A jail or prison official is deliberately indifferent if he knows that an inmate faces

a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *See Farmer v. Brennan*, 511 U.S. 825, 837, 844 (1994). Although the claim arises under the Fourteenth Amendment rather than the Eighth Amendment when the plaintiff is a pretrial detainee, the Eighth Amendment serves as a benchmark for evaluating the claim. *See Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996) (8th Amendment guarantees provide minimum standard of care for pretrial detainees).

Mr. Givens urges that Defendants made various admissions by virtue of their failure to respond to his initial set of requests for admissions. Those requests for admissions were not properly served on the individual Defendants because they were not addressed to either of them personally and were not mailed to the individual Defendants' police station – instead, the requests were addressed to the "San Francisco Police Department Administrator" at the Hall of Justice. The requests for admissions therefore required no response from Defendants and Defendants' initial non-responses to the requests for admissions have no evidentiary value here. (The requests for admissions later were responded to voluntarily after counsel appeared for Defendants but Mr. Givens wants to use the initial non-responses as evidence.)

Viewing the evidence in the light most favorable to Mr. Givens, no reasonable jury could conclude that officer Gratz or officer Merino violated his constitutional right to adequate medical treatment. Mr. Givens provided no evidence that Merino was present when the medical care decision was made, or had any involvement in the medical care request. Merino is unquestionably entitled to judgment on the merits of this claim.

Mr. Givens' evidence shows that, when the intake nurse expressed concern about Mr. Givens' health, officer Gratz asked the nurse to check with a doctor before sending Mr. Givens to the hospital instead of the jail. The triage report dated October 5, 2001 at 15:70 indicates the doctor was consulted. Complaint, Ex. B. Taken in the light most favorable to Mr. Givens, the evidence would allow a reasonable jury to conclude that officer Gratz preferred that Mr. Givens go into the jail rather than the hospital. However, Gratz did not send Mr. Givens into jail, and instead asked the intake nurse to consult with a doctor about the matter. The nurse made the requested call. The evidence indicates that a doctor was consulted and approved Mr. Givens for placement in the county

jail. Mr. Givens was given medications for his diabetes and a sack lunch before he was put in jail population. Asking a nurse to get an opinion from a doctor before taking an inmate from the jail to a hospital – when he could receive medical attention at either location – does not evidence a conscious disregard for the inmate's serious medical needs.

Mr. Givens offers no evidence that being treated and kept at the jail, rather than being transported to the hospital, caused any harm to his physical health. His blood glucose dropped in the several hours after he went to the jail but his evidence also indicates it was dangerously high before his arrest and that he was given medication and food at the jail to address the situation. And when he had low blood sugar several hours later, he was given more food to deal with the low blood sugar. *See* Docket # 1, Ex. B. Notwithstanding his contention that he had an allergic reaction to the metformin he received at the jail, Mr. Givens testified at his deposition that he told the intake nurse that he was taking that same medication before he was arrested. *See* RT 132.

Mr. Givens argues that, because he was not taken to the hospital, he was unable to obtain documentation of his injuries, such as an alleged cut on his ear that he later discovered and thought would aid him in showing the stabbing victim had used a box cutter against him. But obtaining documentation in anticipation of a criminal trial is not a serious medical need. This argument is part of the recurring effort by Mr. Givens to obtain compensation for what he perceives to be an inadequate investigation of his criminal case. Any claim that the failure to take him to the hospital caused him to suffer a conviction would be barred by *Heck*, 512 U.S. 477.

No reasonable juror could conclude that a serious medical need was ignored. At most, Mr. Givens has shown a difference of opinion as to which was the better course of action – sending him to the hospital on the nurse's recommendation or calling a medical doctor to determine whether he could be treated at the jail – but that is not enough to establish liability under § 1983. *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Defendants are entitled to judgment as a matter of law on the merits of Mr. Givens' Fourteenth Amendment claim regarding medical needs.

Defendants also are entitled to qualified immunity against the Fourteenth Amendment claim. The defense of qualified immunity protects government officials "from liability for civil damages

1 insofar as their conduct does not violate clearly established statutory or constitutional rights of
2 which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
3 To determine whether an official is entitled to qualified immunity, the Court must decide whether
4 the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it
5 would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.
6 *Saucier v. Katz*, 533 U.S. 194, 20102 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009)
7 (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular
8 sequence). "[I]f no constitutional right would have been violated were the allegations established,
9 there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.
10 The Court has concluded that the evidence fails to show a violation of Mr. Givens' Fourteenth
11 Amendment rights. Therefore, Defendants prevail on the first prong of the *Saucier* test. As a matter
12 of law, Defendants are additionally entitled to qualified immunity against this Fourteenth
13 Amendment claim.

14 Plaintiff's motion to strike his Opposition filed on September 28, 2011 and to consider in its
15 place the Opposition filed October 21, 2011 is **GRANTED**. (Docket # 87.) The Opposition at
16 Docket # 85 is now stricken from the record.

## V. CONCLUSION

18 For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.
19 (Docket # 67.) Judgment will be entered in favor of Defendants and against Plaintiff. The Clerk
20 shall close the file.

22 IT IS SO ORDERED.

24 Dated: March 19, 2012

_____
EDWARD M. CHEN
United States District Judge